**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ADIANES RODRIGUEZ,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 4:25-CV-02154<br><br>DISTRICT JUDGE MICHAEL J. HENDERSHOT<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Adianes Rodriguez seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. Procedural History

Ms. Rodriguez filed her DIB and SSI applications on March 29, 2023 alleging a disability onset date of January 8, 2023. (Tr. 63, 71.) She alleged disability due to pinched nerve, arthritis, asthma, low back pain, depression, high blood pressure, high cholesterol, and lupus. (Tr. 64, 72.) Her claims were denied at the initial level (Tr. 63, 71) and upon reconsideration (Tr. 88-89), and she requested a hearing (Tr. 130). An Administrative Law Judge ("ALJ") held a telephonic hearing on July 9, 2024 (Tr. 43-62) and thereafter issued an unfavorable decision (Tr. 20-42).

Ms. Rodriguez requested review by the Appeals Council, and her request was denied, making the ALJ's October 31, 2024 decision the final decision of the Commissioner. (Tr. 1-8.) The instant Complaint was filed on October 8, 2025 (ECF Doc. 1) and is fully briefed (ECF Docs. 7, 8). Plaintiff raises the following assignment of error: The ALJ failed to evaluate Plaintiff's subjective complaints. (ECF Doc. 7, p. 10.)

## II. Evidence

### A. Personal, Educational, and Vocational Evidence

Ms. Rodriguez was born in 1980 and was 42 years old on the alleged disability onset date, making her a younger individual under Social Security regulations. (Tr. 64.) She had a limited education (Tr. 349) and has not worked since the alleged onset date (Tr. 64).

### B. Medical Evidence

#### 1. Physical Treatment History[1]

On January 12, 2023, Ms. Rodriguez presented to the Mercy St. Elizabeth Boardman Emergency Room ("ER") with neck pain and dizziness. (Tr. 759-66.) She described feeling a moderate "electric shock" pain in her neck that radiated up the right side of her head and into her right arm. (Tr. 760.) She also reported dizziness or lightheadedness but no other symptoms. (Tr. 761.) On physical examination, she was alert and fully oriented, her neck was supple with full range of motion, she moved all extremities, and she displayed no gross neurologic deficits. (*Id.*) A CT scan of her head showed no acute intracranial abnormality. (Tr. 763.) Blood labs and an EKG were also normal. (Tr. 764.) Ms. Rodriguez was given IV Toradol, and her symptoms improved somewhat. (*Id.*) She was diagnosed with dizziness and discharged in a

[1] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the alleged disability period and relevant to the legal and factual issues before the Court.

stable condition with instructions to follow up with her primary care physician ("PCP") and return if her symptoms worsened. (*Id.*)

On January 16, 2023, Ms. Rodriguez attended an appointment with PCP Christopher Broderick, MSN, APRN-CNP, at One Health Ohio. (Tr. 504-511.) She reported worsening, persistent pain in her middle back and neck that radiated into her arms and numbness in her hands and back. (Tr. 504.) The pain was aggravated by daily activities, lying/resting, standing, twisting, and walking; nothing provided relief. (*Id.*) Her physical examination was normal. (Tr. 507.) MSN Broderick assessed cervical radiculopathy, essential hypertension, anemia, depression with anxiety, and high body mass index ("BMI"). (Tr. 508.) He prescribed Cymbalta for depression and pain and ordered a cervical MRI, thyroid disorder screening labs, and lipid screening labs. (*Id.*)

Ms. Rodriguez went to the Mercy Health Physicians Specialty Care ER on January 20, 2023, reporting dizziness, headache, eye pain, chest tightness, and fatigue. (Tr. 758.) She was diagnosed with pansinusitis and dysfunction of both eustachian tubes, prescribed amoxicillin, methyl prednisone, and cetirizine, and discharged that same day. (Tr. 759.)

On February 3, 2023, Ms. Rodriguez underwent an MRI of the cervical spine that showed: mild levoscoliosis and nonspecific straightening of the normal cervical lordosis; mild bulging discs with no spinal stenosis or cord compression; no abnormal spinal-cord signal intensity; neural foraminal narrowing due to facet and uncovertebral joint hypertrophy; and nonspecific abnormal bone marrow signal intensity at T1, which the reviewing physician noted could reflect atypical hemangioma but did not exclude other etiologies. (Tr. 440-45).

On April 7, 2023, Ms. Rodriguez underwent x-rays of the cervical and lumbar spines. (Tr. 605.) They showed un-leveling and osteoarthritis of the lumbar spine with hypertrophic

spurring at L4 and L5 and severely decreased curve and osteoarthritis of the cervical spine with hypertrophic spurring at C2, C4, C5, and C6. (*Id.*)

On April 11, 2023, Ms. Rodriguez attended an appointment with Kathryn Jurencvich, DO, at Southwoods Physician Services. (Tr. 448-50.) She reported radiating back pain of 7/10 that was burning, pressured, and sharp. (Tr. 448.) Dr. Jurencvich assessed back pain and dorsalgia and ordered an x-ray of the cervical spine. (Tr. 450.)

Ms. Rodriguez returned to see MSN Broderick at One Health Ohio on April 24, 2023. (Tr. 568-76). She reported a cough, dyspnea, and shoulder pain that caused decreased mobility in her left shoulder. (Tr. 569.) MSN Broderick noted that she was ANA positive and referred her to Cleveland Clinic Rheumatology. (Tr. 574.) Due to the recent abnormal MRI of the cervical spine, he recommended she keep an upcoming appointment with orothospine. (*Id.*) He stopped lisinopril and prescribed amlodipine to treat hypertension, continued prescriptions for Biofreeze, cyclobenzaprine, meclizine, naproxen, simvastatin, and a Ventolin inhaler, and discontinued methyl prednisone, and prednisone. (Tr. 574-75.)

On April 26, 2023, Ms. Rodriguez presented to Michelle Lynn Kerns, M.D., at the Cleveland Clinic to be evaluated for lupus. (Tr. 661-62.) She reported muscle stiffness, lethargy, and dizziness, but her physical examination was normal throughout. (Tr. 661.) Dr. Kerns referred her to rheumatology. (Tr. 662.)

On May 3, 2023, Ms. Rodriguez saw Verma Vaibhav, M.D., at Blood and Cancer Center, Inc., for treatment of thrombocytosis. (Tr. 468-70.) Her white blood cell count was normal, and her iron was low normal with normal platelet count. (Tr. 468.) Her physical examination was normal. (Tr. 469.) Dr. Vaibhav assessed microcytic anemia and determined no further work up or intervention was required. (Tr. 470.) She also assessed persistent thrombocytosis and

positive ANA with bilateral symmetric small joint arthritis. (*Id.*) She noted that Ms. Rodriguez was following with rheumatology for arthritis and recommended follow up in three months for a repeat CBC myeloma panel. (*Id.*)

On May 16, 2023, Ms. Rodriguez attended a rheumatology appointment at Cleveland Clinic with Sun Li, PA-C. (Tr. 492-96.) She reported fatigue and continuous, aching, sharp neck pain that was 7/10. (Tr. 492.) PA-C Li noted her positive ANA and diagnosed myalgia, positive ANA, malaise and fatigue, chronic midline low back pain without sciatica, dizziness, chronic cough, and obstructive sleep apnea. (Tr. 495.) She referred Ms. Rodriguez to physical and aquatic therapy and recommended weight management and hydration. (Tr. 495-96).

On June 9, 2023, Ms. Rodriguez underwent an initial evaluation at Atlas Rehab and Wellness Center with Jeffrey Lanam, PT, DPT. (Tr. 713-15.) She reported stiff muscles, numbness in her hands, swelling in her feet, and pain that was 8/10 at best and 10/10 at worst. (Tr. 713.) Upon physical examination, she displayed reduced hip, ankle, and knee flexion at 3 or 4 out of 5. (Tr. 714). PT Lanam recommended therapy three times a week for six weeks. (*Id.*)

From June 9 to August 29, 2023, Ms. Rodriguez attended aquatic and physical therapy a few times a week with PT Lanam, April Russ Isler, PTA, LMT, and Kathy O'Shaughnessy, PT. (Tr. 713-17, 724-36.) At her aquatic therapy session on June 29, she reported having felt sore for three or four days after the previous session on June 22. (Tr. 725.) On July 12, she reported feeling better than after the previous session, but she still felt sore all over and worst in her neck and upper back. (Tr. 726.) She rated her pain as 7/10 and was able to complete her exercises with no change to pain levels. (*Id.*) On July 17, she was very sore and stiff and rated her pain as 8/10. (Tr. 728.) At her third physical therapy session on July 27, Ms. Rodriguez reported decreased pain at 5/10 and agreed that manual therapy and stretching/exercises helped more than

aquatic therapy. (Tr. 729.) Her active range of motion was within functional limits, and hip, knee, and ankle strength were 3 or 4 out of 5. (Tr. 729-30.) On August 29, 2023, she told her aquatic therapist that she felt about the same since starting physical/aquatic therapy. (Tr. 736.)

On June 12, 2023, Ms. Rodriguez saw Terrance P. Wintering at the Cleveland Clinic for assessment of neck and lower back pain. (Tr. 653.) She reported numbness and denied difficulty with walking, weakness, or using her hands. (Tr. 654.)

On July 28, 2023, Ms. Rodriguez went to the Mercy St. Elizabeth ER with a throbbing headache behind her left eye. (Tr. 744-745.) A CT scan of her head was unremarkable (Tr. 748), and her physical examination revealed full orientation and alertness, full range of motion in the neck, no musculoskeletal abnormalities, no focal deficits, 5/5 strength in the upper and lower extremities bilaterally, and normal affect (Tr. 746-47). She was slightly hypertensive, but an EKG showed no signs of acute ischemia. (Tr. 749.) The treating physician noted that Ms. Rodriguez was not taking her hypertension medication, that a repeat blood pressure reading improved, and that a headache cocktail resolved her headache. (*Id.*) Ms. Rodriguez was discharged that same day in stable condition. (*Id.*)

Ms. Rodriguez underwent a consultative examination with Lakshmi Nagireddi, M.D., on December 9, 2023. (Tr. 977-88.) She reported finger-locking, pain in the neck, hands, and waist that ranged from 8/10 to 10/10, and difficulty standing or sitting up straight sometimes. (Tr. 977.) She also reported shortness of breath due to asthma, headaches and nausea from hypertension, hand and arm pain/numbness from pinched nerves, and depressive symptoms including trouble sleeping, crying spells, suicidal thoughts, and feeling socially uncomfortable. (Tr. 977-78.) Her physical and neurological examination showed: normal heart and lung function; nontender swelling of the left clavicle and shoulder; tenderness of the cervical spine

and bilateral hips; grossly normal fine and gross manipulative ability; inability to rise from a squat; ability to rise from sitting unassisted and to get on and off the exam table with ease; normal tandem walking; walking on heels and toes with ease; grossly intact cranial nerves; steady and symmetric gait; intact sensation to light touch throughout; and negative straight leg raise test bilaterally in the sitting and supine positions. (Tr. 980-81.) Ms. Rodriguez was alert and fully oriented, cooperated and gave good effort on the exam, and displayed appropriate mood, normal memory, and good concentration. (Tr. 981.)

On January 3, 2024, Ms. Rodriguez presented at the Mercy St. Elizabeth ER with neck pain but denied any excessive straining of her neck. (Tr. 1011.) Her physical examination showed supple neck with full range of motion, point tenderness to the paracervical region and into the trapezius muscles, 2+ lateral radial pulses, no swelling, and no pain to midline sinus process. (Tr. 1013.) A CT scan of the cervical spine showed: no acute osseous abnormality of the cervical spine; lucent lesion in the posterior midline aspect of T2; developmental fusion of C2 and C3; and moderate right neuroforaminal stenosis at C3 and C4. (Tr. 1012.) Ms. Rodriguez was diagnosed with torticollis, trapezius muscle spasm, foraminal stenosis of cervical region, and lesion of bone of thoracic spine. (Tr. 1014.) A cervical MRI was recommended, and she was discharged in stable condition on January 4 with Toradol and Norflex for pain and instructions to follow up with her PCP. (Tr. 1013-14.)

On January 12, 2024, Ms. Rodriguez went to Quick Med Urgent Care complaining of fatigue, heart racing, heart palpitations, and throat swelling. (Tr. 1142-45.) She thought she was having a reaction to medication recently given to her at the ER. (Tr. 1143.) On examination, she displayed normal heart and lung function, full strength throughout, normal movement in her arms and legs, and no neurological deficits or psychiatric abnormalities. (*Id.*) An EKG was

normal. (Tr. 1144.) While at Urgent Care, Ms. Rodriguez began having a panic attack. (*Id.*) Her heart raced, she began crying, and she paced around the room. (*Id.*) She endorsed constant worry and admitted that she had not been taking her anxiety or depression medications "for a while," and that she was not taking any other medication prescribed by the hospital. (*Id.*) She was prescribed sertraline 50mg for anxiety and depression, referred to psychiatry, and sent home to follow up with her PCP. (*Id.*) She refused supplements and medications to treat fatigue. (*Id.*)

Ms. Rodriguez underwent a cervical MRI on February 8, 2024. (Tr. 995-96.) It showed: no significant central canal stenosis; moderate right neural foraminal stenosis at C3-4; and partially visualized thyroglossal duct cyst inferior to the hyoid bone, approximately measuring 1.7 x 1.2 x 2.0 cm. (Tr. 995.)

**2. Mental Health Treatment**

On February 7, 2023, Ms. Rodriguez attended a counseling intake appointment at One Health Ohio with Nicolette Giordano, LPCC. (Tr. 520-37.) She reported depression, crying without a trigger, struggling to find joy, struggling with concentration daily, and experiencing anxiety and nervousness when not at home. (Tr. 535.) This last problem was worsening in that being around people made her nervous, she had stopped going anywhere except the grocery store (and then only briefly), and she was isolating at home. (*Id.*) She reported thoughts that she would "be better off not here" (*id.*) but denied suicidal ideation, intent, or plan (Tr. 534). Upon mental status examination, her appearance was within normal limits, and her eye contact was average. (Tr. 533.) LPCC Giordana diagnosed major depressive disorder ("MDD"), recurrent, moderate and social phobia, unspecified. (Tr. 536.)

On April 25, 2023, Ms. Rodriguez underwent a psychiatric evaluation at One Health Ohio and was prescribed Vraylar for mood stability/bipolar depression, Depakote for anxiety/irritability, and Seroquel for sleep.[2] (Tr. 588).

On May 23, 2023, Ms. Rodriguez followed up with Brian Soto, MSN, APRN-CNP, at One Health Ohio regarding her psychiatric medications. (Tr. 588). She reported that her mood was labile, irritable, and often anxious, that her sleep was improved on Seroquel, and that she experienced side effects of morning grogginess from Seroquel and sedation from Depakote. (*Id.*) Her psychiatric examination showed full orientation, no anxious mood, no anhedonia, appropriate mood and affect, sufficient language and fund of knowledge, no forgetfulness, hallucinations, memory loss, mood swings or obsessive thoughts, and normal insight, judgment, attention span, and concentration. (Tr. 592.) MSN Soto increased Vraylar, continued Depakote, and increased Seroquel. (Tr. 589.)

Ms. Rodriguez returned to see MSN Soto on June 13, 2023, and reported excessive daytime sedation from Depakote, but her mood was more stable, and she was less irritable and anxious, though she still could get anxious at times. (Tr. 633.) She scored 0 on an anxiety assessment (Tr. 635), and her psychiatric examination remained unchanged from the previous visit (Tr. 639). MSN Soto continued Vraylar and Depakote unchanged, but increased Seroquel and prescribed gabapentin for anxiety. (Tr. 634.)

At a follow-up with MSN Soto on July 13, 2023, Ms. Rodriguez presented without depressed mood, excessive worry, or thoughts of death or suicide. (Tr. 621.) Her mood was more stable overall, though she still got irritable or anxious at times. (*Id.*) She had not been taking gabapentin as prescribed. (*Id.*) She reported that Seroquel helped her sleep, but it still

---

[2] The April 25, 2023 evaluation is referenced in the May 23 treatment note. (Tr. 588.) The full evaluation does not appear to be in the record.

caused daytime sedation. (*Id.*) Her psychiatric examination was normal. (Tr. 627-28.) MSN Soto continued Vraylar, prescribed gabapentin, and discontinued Seroquel, replacing it with Elavil for sleep. (Tr. 622.)

On July 27, 2023, Ms. Rodriguez saw MSN Soto again for medication management. (Tr. 607-17.) She denied any recent symptoms of anxiety and reported that her medication helped, saying Vralyer was "excellent" and gabapentin helped her feel "less anxious" but "wears off early." (Tr. 607.) She denied medication side effects (*id.*), denied concerns about depression (Tr. 608), and reported good sleep (*id.*). Her psychiatric examination was normal. (Tr. 615-16.) MSN Soto increased gabapentin and continued Vraylar and Elavil. (Tr. 608.)

On April 30, 2024, Ms. Rodriquez attended a follow-up appointment with MSN Soto. (Tr. 1107-1117.) She had stopped taking Vraylar because it caused nausea and headaches. (Tr. 1107.) She reported functioning was very difficult and reported labile mood, irritability, anxiety with panic attacks, poor sleep, and often feeling down or depressed. (Tr. 1107-08.) On examination, Ms. Rodriguez was fully oriented, behaved appropriately, was not in denial, was not forgetful, fearful, or anxious, and displayed appropriate mood and affect, normal attention span and concentration, and normal insight and judgment. (Tr. 1113-14.) MSN Soto decreased Vraylar with a plan to increase it again slowly and recommended restarting gabapentin and Elavil as both were efficacious when compliant. (Tr. 1108.)

**3. Opinion Evidence**

**i. Consultative Examiner**

On December 9, 2023, after examining Ms. Rodriguez, consultative examiner Dr. Negireddi opined that: she had no limitations sitting, standing, or walking; she did not need an assistive device; she had mild limitations with lifting and carrying weight; she was limited to

frequent bending, stooping, crouching, and squatting; she had no manipulative limitations; and she had no environmental limitations. (Tr. 982-83.)

#### ii. State Agency Consultants

On June 25, 2023, state agency medical consultant Leon Hughes M.D., opined that Ms. Rodriguez has the Residual Functional Capacity ("RFC") to perform light work subject to the following limitations: standing or walking six hours in an eight-hour workday; sitting six hours in an eight-hour workday; occasionally climbing ladders, ropes, and scaffolds; and frequently balancing, stooping, and climbing ramps and stairs. (Tr. 68-69, 76.) On January 11, 2024, on reconsideration, Elizabeth Das, M.D., largely affirmed Dr. Hughes's findings, except that she opined that Ms. Rodriguez was not limited in her ability to balance and could only occasionally stoop, crouch, and crawl. (Tr. 84-85, 95-96.)

On July 5, 2023, state agency psychological consultant, Gale Sargent, Ph.D., conducted a Psychiatric Review Technique ("PRT"). (Tr. 66-67, 74-75.) She opined that Ms. Rodriguez was mildly limited in the four broad areas of mental functioning and that none of her mental impairments were severe. (Tr. 67, 74.) On January 12, 2024, on reconsideration, Erika Gilyot-Montgomery, Psy.D., affirmed Dr. Sargent's findings. (Tr. 82-83, 93-94.)

### C. Hearing Testimony

At the telephonic hearing on July 9, 2024, Ms. Rodriguez testified through a Spanish interpreter in response to questions from the ALJ and her attorney. (Tr. 45-52.) A Vocational Expert ("VE") also testified. (Tr. 53-61.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Ms. Rodriguez's prior work, but could perform representative positions in the national

economy, including office cleaner, food service worker, and marker. (Tr. 55.) The VE also testified that it would preclude competitive employment if the person would either be off task more than 10% of the workday or absent more than two days per month. (Tr. 60.)

## III. Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520[3]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy. *Id.*

## IV. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

### A. Sole Assignment of Error: The ALJ Properly Evaluated Plaintiff's Subjective Complaints Under the Applicable Legal Standards

In her sole assignment of error, Plaintiff argues that the ALJ "failed to evaluate [her] subjective complaints pursuant to the appropriate legal standards." (ECF Doc. 7, p. 10.)

Specifically, she asserts that the ALJ failed to explain how the medical records were inconsistent with her allegations and failed to consider the regulatory factors in 20 C.F.R. § 404.1529. (*Id*. at pp. 11-14.) The Commissioner responds that the ALJ properly evaluated Plaintiff's subjective symptoms and issued a decision supported by substantial evidence. (ECF Doc. 8, pp. 4-9.)

**1. Legal Standard for Evaluation of Subjective Symptoms**

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones*, 336 F.3d at 476; *see Alexander v. Kijakazi*, No. 1:20-CV-01549, 2021 WL 4459700, at *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462, 49463 (Oct. 25, 2017) (explaining that a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)). If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities. SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers*, 486 F.3d at 247. There is no real dispute that the first step is met in this case (Tr. 34), so the discussion will focus on the ALJ's compliance with the second step.

In undertaking this analysis, an ALJ should consider objective medical evidence, a claimant's subjective complaints, information about a claimant's prior work record, and

information from medical and non-medical sources. SSR 16-3p, 82 Fed. Reg. at 49464-49466; 20 C.F.R. § 404.1529(c)(3). Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 82 Fed. Reg. at 49465-49466; 20 C.F.R. § 404.1529(c)(3). An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case. SSR 16-3p, 82 Fed. Reg. at 49467.

**2. The ALJ Appropriately Evaluated Plaintiff's Subjective Complaints**

The ALJ found that Ms. Rodriguez's medically determinable impairments could be expected to cause the alleged symptoms, but also found "the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence of record." (Tr. 34.) Prior to that finding, the ALJ had considered Ms. Rodriguez's subjective complaints at length, including her allegations of: pain, numbness, and fingers locking; trouble sitting for long periods; difficulty being around people and needing to be alone; problems maintaining attention and concentration; crying spells that lasted all day; and trouble relating to coworkers and supervisors at past jobs. (Tr. 31-32.) The ALJ also considered Ms. Rodriguez's reported daily activities, which consisted of driving to the corner store, shopping, using the internet, and performing chores such as cooking and washing dishes. (Tr. 30, 32.)

Consistent with SSR 16-3p, the ALJ then considered the medical evidence relating to Ms. Rodriguez's medically determinable impairments, including objective diagnostic and examination findings, treatments prescribed to treat her conditions, and her response to treatment. (Tr. 32-33.) The ALJ discussed imaging of the cervical spine that revealed severe right foraminal narrowing at the C2/3 level and abnormal bone marrow signal intensity at T1. (Tr. 32.) She observed that Ms. Rodriguez continued reporting neck pain, headaches, low back

pain, foot swelling, and numbness/tingling in her hands and feet but denied weakness, difficulty walking, or trouble using her hands. (*Id.*) She observed that some physical examinations noted positive findings, but that the exams also noted that Ms. Rodriguez displayed full strength and sensation, intact cranial nerves, grossly normal manipulative abilities, no focal neurological deficits, and the ability to walk unassisted and move all extremities normally. (*Id.*) She also noted that Ms. Rodriguez did not find physical therapy, chiropractic care, or acupuncture helpful for her back and neck pain but also did not have a history of spinal surgery. (*Id.*) She observed that Ms. Rodriguez's mental health records document full orientation, average eye contact, normal attention span, normal mood, appropriate affect and behavior, and no suicidal ideation, intent or plan. (Tr. 33.) She also observed that Ms. Rodriguez told providers her psychiatric medications improved her symptoms. (*Id.*)

The ALJ also discussed the medical opinion evidence in support of her RFC. (Tr. 34-35.) She found the opinions of the state agency psychological consultants at both levels unpersuasive because they found no severe mental impairments while evidence submitted at the hearing level justified a conclusion that Ms. Rodriguez's mental impairments caused moderate limitations. (Tr. 34; *see* Tr. 30.) She found the opinions of the state agency medical consultants mostly persuasive and generally consistent with the medical records and Ms. Rodriguez's conservative treatment history. (Tr. 34.) She also found the opinion of consultative examiner Dr. Nagireddi somewhat persuasive but noted that the opinion was vague and not fully stated in vocational terms. (Tr. 34-35.) The ALJ concluded that Dr. Nagireddi's opinion did not contain greater limitations than those contained in the RFC. (*Id.*)

After discussing Ms. Rodriguez's reported symptoms, daily activities, and the medical records at length, the ALJ summarized her findings related to Ms. Rodriguez's subjective reports and incorporated them into the RFC as follows:

> The claimant's allegations are determined to be less than fully consistent with the evidence. The nature and degree of pain and functional limitations alleged by the claimant is not supported by medical and non-medical sources. Diagnostic test results and physical examination findings have been largely unremarkable, and the claimant had a mostly conservative treatment for her physical health impairments since the alleged onset date such as pain medications and physical therapy sessions. For example, a physical examination performed in January of 2024 revealed that the claimant was alert and oriented to all spheres, in no acute distress, there were no focal neurological deficits, strength was five out of five throughout, and she moved all of her extremities normally [].
>
> Regarding the consistency of the claimant's mental health allegations, she had a limited treatment history since the alleged onset date, she testified that she refuses to receive further counseling, she admitted seeing a positive response to her psychotropic medications, without significant side effects, and there is no evidence of psychiatric hospitalization in the record. Such absence of documentation of ongoing treatment is inconsistent, and it seriously undermines allegations of disabling, or even severe, limitations of function, lasting twelve months in duration, and despite treatment []. Additionally, the claimant reported mostly mild to moderate level symptoms to providers at One Health Ohio and other sources, without evidence of hallucinations, delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other serious issues []. Thus, there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 33-34 (citations omitted).)

The ALJ's decision thus considered the factors set forth in SSR 16-3p and 20 C.F.R. § 404.1529(c)(3), contained "specific reasons for the weight given to the individual's symptoms," and made findings that were "consistent with and supported by the evidence." SSR 16-3p, 82

Fed. Reg. at 49467. Contrary to Plaintiff's assertion that the ALJ "merely summarized the findings without explaining the significance of the findings in relation to Plaintiff's allegations" (ECF Doc. 7, p. 14), the ALJ explicitly connected specific medical records to her finding that Plaintiff's subjective complaints were "not entirely consistent with the medical evidence and other evidence in the record" (Tr. 34). Further, the ALJ couched her findings relating to the reported symptoms within a detailed discussion of reported daily activities, medical records often showing full strength, sensation, and ability to walk despite pain, mental health treatment records noting mostly normal mental status examinations and a positive response to medication, and medical opinions that found her at most moderately limited in relevant areas of physical functioning and mildly limited in relevant areas of psychological functioning. It is clear that the ALJ adequately articulated her reasons for finding the reported "intensity, persistence and limiting effects" of Plaintiff's symptoms were not "entirely consistent" with the record. (Tr. 34.)

Ms. Rodriguez contends that her allegations "are consistent with the objective medical and other evidence in the record" and cites treatment notes that she claims support her position. (ECF Doc. 7, pp. 13-14.) But "[t]he substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts," *Blakley*, 581 F.3d at 406 (internal quotations omitted), and it is not this Court's role to "try the case *de novo*, []or resolve conflicts in evidence[.]" *Garner*, 745 F.2d at 387. Even if substantial evidence supported greater restrictions in the RFC based on Plaintiff's subjective symptoms, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Given the complete evidentiary record and the ALJ's thorough consideration of the evidence discussed

above, the undersigned finds that her decision regarding Ms. Rodriguez's subjective symptoms was supported by substantial evidence.

For the reasons explained above, the undersigned finds Ms. Rodriguez has not met her burden to show that the ALJ erred in evaluating her symptoms or that her analysis lacked the support of substantial evidence. Accordingly, the undersigned finds the sole assignment of error to be without merit.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

September 11, 2026

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).